

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-09-011-CV

IN THE INTEREST OF T.A.M.
AND B.G.W. A/K/A Z.W.,
CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellants P.M. and N.W. appeal the trial court's order terminating their parental rights to their daughters T.A.M. and B.G.W. a/k/a Z.W. After a bench trial, the trial court found by clear and convincing evidence that P.M. and N.W. engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, knowingly placed or knowingly allowed the children to remain in

---

[1] ... See Tex. R. App. P. 47.4.

conditions or surroundings which endanger their physical or emotional well-being, and constructively abandoned the children.[2] The trial court also found that termination of the parent-child relationships would be in the children's best interest. We affirm the trial court's judgment of termination.

## N.W.

In her sole issue, N.W. argues that the evidence is factually insufficient to show that termination of her parental rights is in the children's best interest. In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own.[3] We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child.[4] If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

---

[2] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N) (Vernon Supp. 2009).

[3] *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

[4] Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.[5]

There is a strong presumption that keeping a child with a parent is in the child's best interest.[6] Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.[7] The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

---

[5] ... *H.R.M.*, 209 S.W.3d at 108.

[6] ... *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[7] ... Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008).

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;
>
> (D) a safe physical home environment;
>
> (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and
>
> (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.[8]

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)　　the desires of the child;

(B)　　the emotional and physical needs of the child now and in the future;

(C)　　the emotional and physical danger to the child now and in the future;

(D)　　the parental abilities of the individuals seeking custody;

(E)　　the programs available to assist these individuals to promote the best interest of the child;

(F)　　the plans for the child by these individuals or by the agency seeking custody;

(G)　　the stability of the home or proposed placement;

(H)　　the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)　　any excuse for the acts or omissions of the parent.[9]

These factors are not exhaustive. Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered

---

[8]... *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

[9]... *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

when appropriate.[10] Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.[11] On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[12]

The evidence showed the following. Neither T.A.M., born April 4, 2007, nor B.G.W., born February 25, 2008, ever lived with N.W., who also had two older daughters in the custody of the State at the time of trial.

N.W. grew up in an unstable household; her mother was a crack cocaine addict who still used drugs at the time of trial. When N.W. was twelve years old, she tried to strangle herself. When she was thirteen, she attempted to overdose on medication. She was pregnant with her first child by the age of fourteen.

N.W., who was twenty-three years old at the time of trial, began using marijuana when she was seventeen years old and was using it heavily by the time she had her second child. She told Nichelle Wiggins, who performed her psychological evaluation, that she used marijuana during her pregnancies but that she stopped using in December 2007. N.W. testified that she used

---

[10] ... *C.H.*, 89 S.W.3d at 27.

[11] ... *Id.*

[12] ... *Id.*

6

marijuana heavily three to four years, including during her pregnancy with T.A.M., but used only off and on during her pregnancy with B.G.W. because she was "learning how to be sober." When asked whether continuing smoking was a good decision, she responded, "Without guidance, how am I going to know what's good and bad? That's the same with my kids. How am I going to know what's right and wrong if I don't have no one to tell me this is right and this is wrong?" She admitted at trial that she had not had such guidance in her life and that she had no support system. She had told Wiggins that her children were her support system.

Wiggins testified that N.W.'s addiction to drugs was strong, as exemplified by her inability to stop using drugs during her pregnancies despite her knowledge of the risks to her unborn children.

T.A.M. and B.G.W. both tested positive for marijuana at birth. N.W. tested positive for marijuana at T.A.M.'s birth and admitted to smoking marijuana within three days before B.G.W.'s birth and only a day after testing negative for marijuana. During the pendency of the case, N.W. completed a twenty-four-hour outpatient drug treatment course, with classes once a week for about two and a half months, but she tested positive for drugs even after treatment. She was tested about once every two months until November 2008. Joy Denney, one of N.W.'s CPS caseworkers, testified that N.W.'s only

7

negative test was in February 2008. N.W. claimed that she had more than one negative drug test but admitted using marijuana in August 2008, a month before trial was originally set. She testified that she did not take a drug test in the week before trial because of transportation issues.

N.W. testified that many things trigger her to use marijuana: thinking about her children, CPS's focus on what she was doing wrong instead of what she was doing right, and even things going well in her life.

T.A.M. was born with medical issues, including short gut syndrome, that required her to stay about six months in the hospital after her birth. Originally, the State's plan was for T.A.M. to be transitioned into N.W.'s care after T.A.M.'s release from the hospital. The service plan's goals for N.W. included stable employment, stable housing, and drug assessment and treatment. But at the time of T.A.M.'s release, N.W. did not have stable housing or stable employment, and she was not compliant with drug testing. T.A.M. was placed in a primary-medical-needs foster home upon her release from the hospital. N.W. testified that she "took it as a joke" when T.A.M. was removed.

A new service plan was created in October 2007 when CPS caseworker Denney was assigned to the case. It required the parents to learn to care for a medically fragile child, complete a drug assessment and follow through with recommendations, complete a psychological evaluation, and maintain a safe and

8

stable home. P.M. was required to obtain and maintain stable employment; that was not a requirement for N.W., but Denney encouraged her to also obtain and maintain stable employment.

In January 2008, after N.W. told Denney that they were being evicted and that she did not know where they would go, CPS removed N.W.'s older two children because of the homelessness and N.W.'s continued drug use. Those children were placed in a basic foster home.

Around this time, Denney discovered that N.W. was pregnant. N.W. had received no prenatal care beforehand. B.G.W. was born on February 25, 2008, and placed separately from her siblings because there were no additional openings in their foster homes. At this time, according to Denney, N.W. and P.M. still had no specific plan to improve their lifestyle.

By February 2008, N.W. and P.M. had found an apartment, but when Denney visited, she discovered that it had no place for the children to sleep, bugs were crawling in the cabinets and kitchen, and bags of trash were lying on the floor.

N.W. did not take parenting classes before September 2008 or offer any explanations, despite Denney's recommendations. On cross-examination, Denney admitted that N.W. had taken an eight-hour relationship course offered by The Parenting Center but stated that she had explained to N.W. that the

parenting classes had to be parenting classes. Denney testified that the parents had never told her that there was an issue with going to the Parenting Center. Denney also admitted that Volunteers of America (VOA) offered parenting classes at home but noted that the parents had to have stable housing to qualify and that N.W. had not qualified while Denney was her caseworker.

Denney testified that N.W. had completed training regarding T.A.M.'s medical issues but opined that such training was not as pertinent at the time of trial because of T.A.M.'s improvement.

Denney testified that N.W. did not complete any individual counseling despite recommendations and provided no explanations. Denney admitted that she could not confirm whether N.W. went to counseling because the counselor that N.W. was supposed to go to would not release any information, and N.W. did not obtain a release or notify CPS that she had done so. N.W. testified that she gave CPS proof that she saw the counselor but that Denney said that it was not good enough. But N.W. also admitted that she did not complete counseling.

N.W. did not have any stable employment before September 2008.

When Denney went on maternity leave in September 2008, N.W. was still in the same apartment that she and P.M. had shared since February 2008, but she had no job, P.M. did not report stable employment other than day labor,

10

and both of them still tested positive for drugs. Denney did not believe that the parents had done anything to convince her that the children would be safe in their home, and she believed that termination was in the children's best interest. She believed that the parents had not substantially complied with the service plan. Specifically, she did not believe that N.W. had complied because she had not fully completed the recommendations from the psychological evaluation or parenting classes, had not obtained stable housing, and had continued to test positive for drugs.

Michael Tolle, the third CPS caseworker, who staffed the case from October 27, 2008 until mid-December 2008, the time of trial, testified that at the original trial setting in September 2008, the parents had requested a continuance so that they could work their services, including taking drug tests and completing parenting classes and individual counseling. They had no housing at the time. The drug tests that they took in September 2008 came back positive. N.W. reported on December 3, 2008, less than two weeks before trial, that she was getting an apartment, but Tolle had not yet visited the apartment as of the time of trial. An initial meeting between VOA and N.W. had also occurred in December 2008 before trial. The caseworker had not set up individual counseling, nor had the parents requested it.

11

The parents missed visits with the children in November 2008. Overall, P.M. visited the children maybe five times over the approximately fifteen months of CPS custody before trial began. N.W. visited faithfully at first but missed some visits in the spring of 2008 because of transportation issues and missed several visits in a row in the summer of 2008. She testified that she went to Minnesota to get "a mental break" from Texas.

Tolle also testified that N.W. had had enough time to obtain stable housing but did not have it at the time of trial. She testified that she had been in her apartment for a week. Tolle testified that he did not believe that either parent was in a position to provide the children with a safe and stable home. Further, he testified that neither parent had demonstrated any changes to the lifestyle that had necessitated the removals in the first place.

On cross-examination, Tolle admitted that it was potentially possible that the parents could achieve more stability with more time. As Wiggins pointed out, while parents sometimes need more time,

> [Y]ou still have children who are developing and growing and they need some stability and they need to know who their primary caregivers are going to be and who is going to be there to nurture them and develop them, and children can't always sit and wait while Mommy and Daddy get it together.

Denney testified that the permanency plan for the two little girls if termination occurred would be adoption and placement together. B.G.W.'s

12

foster parents want to adopt both children. T.A.M.'s foster home is not adoption motivated. Tolle testified that T.A.M. had no medical needs and that he knew of no impediment to placing her in the home in which B.G.W. already resides.

B.G.W. has done well in her foster home. Her foster mother testified that she had been in their home almost ten months and was healthy, happy, and beginning to walk. The foster mother admitted that she had seen T.A.M. briefly in the car with a CPS employee before visits but had had no interaction with her. She testified that "[i]t's scary to take a baby that we haven't had a relationship with, but [B.G.W.] is such an amazing part of our family, we figure [T.A.M.] probably will be, too." The foster mother had been told only the week before trial that T.A.M.'s status had been changed from medical to basic.

In fact, testimony showed that T.A.M. had improved greatly. At the time of trial, she no longer needed oxygen or a feeding tube or any ongoing care or treatment that would require her to be in a primary-medical-needs home.

B.G.W.'s foster mother testified that she knows that there will be some diet issues and challenges and some research necessary in caring for T.A.M. She testified that she and her husband are open to a smooth transition and adoption and that they would be committed to providing the two little girls a safe and stable home for as long as they need.

13

Based on our review, we hold that the evidence is factually sufficient to support the best interest finding.  We overrule N.W.'s sole issue.

P.M.

P.M.'s court-appointed appellate counsel has filed a motion to withdraw and an *Anders* brief in support stating that after diligently reviewing the record, he believes that any appeal by P.M. would be frivolous.[13]

On April 1, 2009, we sent P.M. a letter notifying him of his due date to inform this court if he desired to examine the record and file a pro se brief in response to his counsel's motion to withdraw and *Anders* brief.  The letter was returned, with the envelope bearing the U.S. Post Office notations "Return to Sender," "Attempted – Not Known," and "Unable to Forward."  Additionally, P.M.'s appointed counsel informed this court that the copies of his motion to withdraw as counsel and *Anders* brief mailed to P.M. at the address provided to counsel were also not delivered to P.M. but were returned to counsel by the U.S. Post Office.

In the interest of justice, we abated the appeal and remanded this case to the trial court for a hearing.  Despite evidence that caseworker Tolle had given P.M. written notice of the abatement hearing, P.M. did not appear.  Tolle

---

[13]... *See Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967).

had asked P.M. for a physical and mailing address; P.M. told Tolle that he was staying with different friends but did not give him an address. The record indicates that Tolle would attempt to give P.M. a copy of the *Anders* brief at the next visit with N.W.'s older daughters. P.M. has not filed a response to the *Anders* brief.[14] The State has requested that we consider the appeal based on the record.

P.M.'s appointed counsel's brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds of error to be advanced.[15] As the reviewing appellate court, we must conduct an independent evaluation of the record to decide whether counsel is correct in determining that P.M.'s appeal is frivolous.[16]

Having carefully reviewed the record and the appellate brief, we agree with P.M.'s appellate counsel that his appeal is frivolous and without merit. We find nothing in the record that might arguably support the appeal.[17]

---

[14] *See In re Schulman*, 252 S.W.3d 403, 408 n.21 (Tex. Crim. App. 2008).

[15] *In re D.D.*, 279 S.W.3d 849, 850 (Tex. App.—Dallas 2009, pet. denied).

[16] *See id.*; *see also Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991).

[17] *See D.D.*, 279 S.W.3d at 850; *see also Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005).

Accordingly, we grant P.M.'s counsel's motion to withdraw and affirm the trial court's judgment terminating the parental rights of N.W. and P.M. to the children T.A.M. and B.G.W.

PER CURIAM

PANEL:  DAUPHINOT, GARDNER, and MEIER, JJ.

DELIVERED:  January 21, 2010